NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13239

COMMONWEALTH  vs.  JOHN B. WITTEY.

Plymouth.     March 10, 2023. - June 5, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, & Wendlandt, JJ.


Homicide.  Firearms.  Constitutional Law, Search and seizure.
Search and Seizure, Curtilage, Motor vehicle, Probable
cause.  Probable Cause.  Self-Defense.  Evidence, Self-
defense, Age.  Duress.  Practice, Criminal, Capital case.



Indictments found and returned in the Superior Court
Department on May 24, 2016.

A pretrial motion to suppress evidence was heard by Gregg
J. Pasquale, J., and the cases were tried before Cornelius J.
Moriarty, II, J.


Dana Alan Curhan for the defendant.
Carolyn A. Burbine, Assistant District Attorney, for the
Commonwealth.


CYPHER, J.  The defendant, John B. Wittey, was convicted of

murder in the first degree on theories of both deliberate

premeditation and extreme atrocity or cruelty, after he shot and

stabbed the victim, John Williams, in the victim's home,

following his discovery of a romantic affair between the victim and the defendant's deceased partner. On appeal, the defendant argues that a State police trooper's examination of his vehicle, visibly parked in the driveway leading up to his house, constituted a warrantless search within the curtilage of his home. He argues that his motion to suppress the evidence recovered pursuant to a search warrant following these observations wrongfully was denied. He further asserts that this court should vacate or reduce his conviction of murder in the first degree under G. L. c. 278, § 33E (§ 33E), based on the self-defense theory he presented at trial, and based on his age, the circumstances surrounding the killing, and his mental state at the time, which he suggests shows that he was acting under some degree of duress.

We hold that the defendant's vehicle was not parked within the curtilage of his home and that, therefore, the trooper's observations of the vehicle did not constitute a search for constitutional purposes. Discerning no error in the verdict of murder in the first degree after plenary review of the entire record, we decline to exercise our authority under § 33E to reduce the verdict or order a new trial.

1. Background. a. Facts. We discuss the facts that the jury could have found, reserving some details for later discussion.

The victim was the president of a ham radio club,[1] a golfer, a pilot, and a father. He had a license to carry a firearm and occasionally would do so. Judy Harris, the defendant's partner of over twenty years whom he considered to be his wife, was the vice-president of the ham radio club. Harris and her grandson Anthony, whom she and the defendant raised, lived at the defendant's home.[2] While Harris was in a relationship with the defendant, she had a years-long affair with the victim. The victim and the defendant knew each other; there was conflicting testimony surrounding whether they were friends. Harris was diagnosed with stage four ovarian cancer in 2012, from which she passed away in January 2016.

On the evening of February 8, 2016, at around 9:30 P.M., Roberta Delorie, a friend of the victim, spoke with him by telephone and planned to meet him for breakfast the next morning at a restaurant.[3] The victim was to pick her up at 10 A.M. the next morning. That night, there was a snowstorm. When it

---

[1] Ham radio also is known as amateur radio. Britannica, https://www.britannica.com/technology/amateur-radio [https://perma.cc/WK4F-YB88].

[2] The defendant also was a ham radio operator. Anthony, who also was in the ham radio club, could not recall whether the defendant was a member but recalled the defendant going to meetings frequently.

[3] On her 911 call to the police, she identified the victim as her boyfriend.

snowed, the victim would go out each hour and measure the snow for his pilots' association.

The next morning, on February 9, 2016, the victim did not arrive at Delorie's home as promised, which was unusual for him. When it neared 10:30 A.M. and the victim did not answer her calls, Delorie decided to drive to the victim's house, located on Glen Charlie Road in Wareham, using her son's car. When she arrived, she parked in the victim's driveway and walked to his front door. She entered the house with a key given to her by the victim.

When she opened the door, she saw white matter hanging from the ceiling and a thick purple substance on the floor. She noticed the victim on the floor, wearing boxer shorts and a T-shirt, with a bulge underneath his shirt. She also saw three bullets or casings near each other by the victim's feet. She called 911 and listened to the dispatcher, who instructed her to leave the house without touching anything.

Sergeant Walter Correia of the Wareham police department was the first officer on the scene. He noted blood on the walls and floor, as well as casings on the floor. Initially, he believed that the victim's death was the result of a suicide. He did not see a firearm, but believed that it could be under the victim's body. The victim's body was a short distance, approximately six feet, from the doorway. Correia remained

outside in order to maintain the scene as it was, and more officers and emergency medical service paramedics arrived at the scene.

State police Lieutenant Leonard Coppenrath arrived at the victim's home as well. There were two vehicles in the driveway, one belonging to the victim and the other belonging to Delorie, and there was freshly fallen snow on the ground. When he arrived, Coppenrath traveled the perimeter of the property to look for footprints. He only observed footprints traceable to first responders on the scene. Until he arrived, the officers present ensured that no one else entered the home.

State police Sergeant William Tarbokas, who is trained in tire tread examination, responded to the victim's home to perform analysis with personnel from crime scene services. He found no fingerprints of value for identification purposes. Tarbokas saw that there was a third tire track underneath the middle of Delorie's car, which preserved the track from melting due to sunlight. He took photographs of the third track to be used for comparison.

In the kitchen area, behind the victim's body, officers located a beer bottle for a specific brand, Beck's, which bottle was on its side leaning against a scratch post for a cat. Coppenrath noticed three closely grouped gunshot wounds to the right side of the victim's head, just above his ear, and a

gunshot wound and stippling on the top of his head.  In addition to observing those gunshot wounds, Trooper David Collett noticed two more entrance wounds to the victim's back after pulling back his shirt, which had two holes in it.  Coppenrath observed a laceration on the victim's arm, and once the victim was turned over, he noticed a laceration to the victim's stomach area with "innards . . . protruding."  At that point, officers were aware that this was not a suicide, but a homicide.[4]

Police recovered two live rounds and three spent shell casings surrounding the area of the victim's body.  They also recovered two bullet fragments, jacketed spent projectiles, which had been fired and were lodged in the flooring.  The victim owned several firearms, which were located in his home, in a closet.  Coppenrath testified -- despite the cat food

---

[4] The medical examiner testified that the victim died from multiple gunshot wounds and sharp force injuries, any of which potentially may have been fatal if left untreated.  She observed an entrance and exit gunshot wound and sharp force injury to his left hand, which fractured a bone in his hand; a graze gunshot wound on his left forearm; intestines protruding from a stab wound on his torso; an entrance gunshot wound in the middle of his chest; an entrance gunshot wound on his left hip; two entrance gunshot wounds on his back, one of which lacerated his right lung and exited through his chest; an entrance gunshot wound on the left side of his face, which perforated several organs; three entrance gunshot wounds to the right side of his head; and a gunshot wound to the top of his head.  Several projectiles were recovered in different parts of the victim's body, including his hand, hip, shoulder, spine, torso, and brain.  There was stippling on the victim's body suggesting that a firearm was fired at close range.

scattered on the floor of the victim's home, the bottle opener on the floor, and the watch that was detached at the hinge and on the floor -- that he did not believe the victim died in a struggle because there were a significant number of items in the kitchen area that were undisturbed.

Trooper Jason Abramoski arrived at the scene and remained outside. He canvassed the neighborhood, without success, in an effort to determine whether anyone had heard or seen anything unusual or maintained surveillance cameras that would have aided in the investigation. As a result of a conversation between the victim's children and Collett on scene, Abramoski was dispatched to speak with the defendant. After reporting to the Wareham police department, Abramoski went to interview the defendant at his home on Plain Street East in Berkley. He took with him Detective William Dasilva from the Wareham police department and Sergeant David Bernard from the Berkley police department.

When they arrived at the defendant's residence, Abramoski noticed two Toyota motor vehicles, a Yaris and a Sienna, in the driveway. After Abramoski knocked, the defendant answered the door. Abramoski asked the defendant whether the officers could speak to him about the whereabouts of the victim and the defendant's relationship with the victim; the defendant agreed and invited the officers inside.

The inside of the defendant's home was cluttered, unkempt, and dark. Before they spoke to the defendant, the officers allowed him to go upstairs to let Anthony know that they were there and to get shoes. The defendant began to tell the officers that he had met the victim through Harris, who had passed away about two weeks prior. When Harris was ill, the victim frequently visited her during her treatments. The defendant produced a printed e-mail message from a pocket of his shirt, and he indicated that he had discovered that the victim and Harris had been "a little bit more than just friends." When asked to explain the message, the defendant stated that it made him upset, and he handed the printout to Abramoski. The message, dated September 9, 2014, was written from Harris to the victim. It revealed a sexual and romantic relationship between the victim and Harris, through which the victim got to know Anthony and Harris got to know the family of the victim. The message further revealed that the victim had ended the relationship, which devastated Harris.

After the defendant produced the e-mail message, Abramoski asked him if he would consent to recording the interview. The defendant agreed, and they moved to another room so that the defendant could sit down. During the recorded interview, the defendant explained that he found the e-mail message one week

after Harris passed away.[5]  The defendant stated that he was upset about the message and decided to go for a "joyride," leaving between 10 P.M. and 11 P.M. for Dover, New Jersey, returning in the early morning of February 9, 2016.[6]  He told the officers that he drove the Toyota Sienna on this trip.

After the interview, the defendant agreed to go with the officers to the Berkley police department for a formal interview.  When he arrived at the police station and after being read the Miranda rights for a second time, he indicated that he would not like to make any statements.[7]  At the police station, the defendant gave the officers the clothing that he was wearing and consented to being photographed.  There was a Beck's bottle cap found in the pocket of the defendant's jeans.

---

[5] At some point in the investigation, officers found a printout of a second e-mail message from Harris's account, dated September 20, 2014, further detailing her anguish over the breakup with the victim and the victim's new girlfriend.  In an upper corner of the printout, there was a date stamp indicating that it had been printed on the day before the victim was found dead in his home.

[6] Anthony, who still lived in the defendant's home, stated that the defendant left in the evening of February 8, 2016, and did not return until the next day.

[7] This testimony was admitted at the hearing on the motion to suppress, but not the trial.

The defendant was allowed to leave and was picked up by his friend, Philip Dann.[8]

Ruth Ragnaldsen Battaglini, a forensic scientist with the State police crime laboratory, conducted testing and analyzed the scene of the murder.  A significant number of presumptive tests conducted at the scene were positive for the presence of blood.  On February 9, 2016, while the defendant was at the Berkley police station, Battaglini observed his condition and noted that there was a reddened area on his right knuckles and a cut and scratch on his left hand.  On a screening test, the defendant's hands tested positive for the presence of blood. The defendant's vest, which he was wearing at the police station, tested positive for human blood on both the interior and exterior.  The defendant's sweater and jeans also tested positive for human blood.[9]  The deoxyribonucleic acid (DNA)

---

[8] Throughout his interactions with the defendant, Abramoski did not observe the defendant to be injured or have trouble walking.  Collett testified that at the time of the defendant's subsequent arrest on February 12, he did not observe any injuries to the defendant.  However, Collett was impeached with his grand jury testimony where he stated that there was redness on the defendant's right knuckle area, a cut on his left thumb, and a scratch on his left wrist.

[9] His shoes tested negative for the presence of blood.

obtained from a red-brown stain on the front of the defendant's sweater matched the victim's DNA profile.[10]

Dann testified that when he picked up the defendant, the defendant's demeanor was subdued, which was different from earlier interactions he had had with the defendant. After attempting to drop off the defendant at a residence in Pembroke where no one was home, Dann brought the defendant to his office to stay there for the evening. During the drive, Dann asked the defendant "what was going on," and the defendant told Dann that his friend had gone missing and that the police brought him in to question him. When asked if he "had anything to do with it," the defendant replied that Dann "didn't want to know anything about [it]." At the office, the defendant told Dann that Dann did not want to be involved and that this was a "bad thing."

Search warrants were issued in connection with the case, including those for the defendant's residence and the Toyota Sienna, which officers searched on February 10, 2016. In the Sienna, officers found a case of Beck's beer containing three full beers, a Beck's beer bottle cap, a global position system (GPS) device, two rounds of nine millimeter ammunition, and two rounds of .44 Magnum ammunition, among other things. Tarbokas

------

[10] The expected frequency of occurrence of the profile was approximately one in 3.418 quintillion related individuals (a quintillion is a one with eighteen zeros following it).

participated in the execution of the search warrants, and he observed the tires of both the Yaris and the Sienna.  The Yaris tires were much smaller in width and size than the impression photographed at the victim's home.  He took impressions from the tires on the Sienna, which were all of the same type.  Tarbokas opined that the tread marks from the Sienna were of the same class as those found at the victim's residence, concluding that the tread could have been made by a tire on the Sienna or any other tire with a similar design and size.  When screened for nonvisible or occult blood, the front driver's side exterior and interior door handles, front driver's side seat back and bottom, front driver's side seat belt, steering wheel, gear shift, car key, and remote tested positive for blood.

Trooper Francis Driscoll, who participated in the execution of the search warrant for the Sienna, examined the files on the GPS located in the Sienna, attached to the windshield.  The files on the GPS showed that on the night of February 8, 2016, into the early morning of February 9, the Sienna was driven multiple times to and from the area surrounding the victim's residence.  The first activation of the GPS on February 8 was at 7:33 P.M. and placed the Sienna on Seymour Street in Berkley. The Sienna was driven to the area of Glen Charlie Road in Wareham at 9:08 P.M., and driven back and forth on Glen Charlie Road until 9:29 P.M.  At 9:57 P.M., the Sienna returned to Glen

Charlie Road and remained to traverse the street until 10:09 P.M. The Sienna arrived back at the defendant's Plain Street East address in Berkley at 10:55 P.M. and began moving again at 11:23 P.M. At 12:01 A.M. on February 9, the Sierra arrived at Glen Charlie Road in Wareham for a third time, and ultimately came to a stop in an area four to six houses away from the victim's home at around 12:03 A.M. After several minutes remaining stationary, the next activation of the GPS was at an address next to the victim's home at 12:10 A.M., after which the Sierra then traveled south and was switched off in Fairhaven at 12:53 A.M.

In the defendant's residence, officers secured fifteen empty Beck's beer bottles, as well as a piece of paper on top of a pile of papers with the name of the victim and a telephone number written on it. The empty Beck's beer bottles in the defendant's garage, the full bottles in the Sienna, and the bottle found in the victim's home all had the same lot number.[11] Officers also found another piece of paper with the name "Trish"

---

[11] Brandon McGrath, a quality manager of a brewery that produces Beck's beer at some of its locations, explained the lot number on the bottles and stated that, operating at maximum capacity, 600 beers per minute in fifteen-minute increments would share the same lot number.

and a telephone number,[12] as well as the name "Williams" and "121 Charlie R or Rd."

On February 12, 2016, a warrant issued for the defendant's arrest. Officers executed the warrant at the home of the defendant's daughter. When the officers confronted the defendant in the doorway of the home, he stated, "Oh, it looks like my ride is here."

On March 18, 2016, Robert Costanzo and Andrew Campbell were assisting their friends John and Chrissy Nelson in cleaning out the defendant's cluttered home, specifically focusing on the garage.[13] In a silver box in the garage, after unscrewing approximately twenty screws to the door of the box, John located two firearms and seven boxes of ammunition.[14] They called police, who collected the firearms and ammunition. The firearms later were confirmed to have been purchased by the defendant.

One of the firearms was a revolver. When it was recovered, it was loaded with six live rounds of .22 Magnum caliber ammunition. The other was a nine millimeter Taurus

---

[12] Trish was a local nurse who cared for Judy in hospice.

[13] Chrissy is the defendant's daughter.

[14] When officers executed the search warrant on February 10, 2016, the silver box was inaccessible because several items blocked the area.

semiautomatic pistol.[15]  The magazine, which was removed, contained one round of live ammunition; there was also one round of live ammunition in the chamber of the pistol.  The boxes of ammunition that were recovered were .22 Magnum and nine millimeter ammunition.  The revolver tested positive for the presence of blood on the interior of the barrel and the side of the firearm.  The DNA profile found on the side of the revolver matched the victim's DNA profile.[16]  Lieutenant John Conroy, the head of the ballistics unit for the State police in Lakeville, test fired both firearms, which fired properly.  It was Conroy's opinion, to a reasonable degree of ballistic certainty, that the discharged shell casings found at the scene were fired from the nine millimeter Taurus semiautomatic pistol found at the defendant's residence.  He also analyzed a projectile recovered from the floor of the victim's residence, and his comparison to the test firing that he conducted was inconclusive.  He examined seven other projectiles recovered during the investigation, which were consistent in diameter with .22 caliber ammunition.

---

[15] In a revolver, unlike in a semiautomatic weapon, the discharged cartridge casings remain in the cylinder until they are manually removed; they are not ejected from the weapon on firing.  If there is a malfunction or jam in a semiautomatic weapon, then moving the slide to the rear to "rack the weapon" will eject a live round from the weapon without firing it.

[16] The expected frequency of occurrence of the profile was approximately one in 1.071 nonillion unrelated individuals (a one with thirty zeros after it).

Although he found several similarities with the test firing from the revolver recovered at the defendant's residence, he did not feel that there was "a sufficient agreement of individual markings" to opine to a reasonable degree of ballistic certainty whether they were fired from that weapon.

After the Commonwealth rested its case, the defendant testified. The defendant met Harris in 1992; after six months of dating, she moved into his home and lived with him until her death in January 2016. While Harris was sick, the defendant took her to her doctor appointments and the hospital, and took care of her at home. The defendant testified that starting in 2011, Harris became very hostile toward him until her death. During that period, the victim would come over four or five days per week.

The defendant testified that on February 8, 2016, he found the printout of the e-mail message written from Harris to the victim in September 2014 in a laundry bag that he was cleaning out.[17] When he first started reading, he thought the message was written to him, but he then realized that it was not when it referenced the recipient sleeping with two women. After the defendant found the message, he began to try to find any other evidence of the affair to confirm it. He then found a second e-

---

[17] The defendant admitted on cross-examination that he lied about finding the letter a week before the murder.

mail message on Harris's account that confirmed the relationship. The defendant was "astounded" and "so upset and angry [that he] wanted to confront [the victim] and ask him what's been going on the last five years." He felt "doubly bad" because the victim treated Harris poorly.

The defendant knew that the victim had purchased a house on Glen Charlie Road in Wareham, so he inputted the address into his GPS device and drove there, despite the severe snowstorm. When he got there, he did not recognize anything, so he turned around and drove home. When he returned home, he found a piece of paper with the victim's address, which misidentified the street number by one. According to the defendant, his intent was not to shoot the victim, but to determine "why he was so mean to [Harris], why he had destroyed her." When he drove back to Glen Charlie Road, he could not see the street numbers on the houses or the mailboxes because they were covered in snow. As he was driving farther up the road, he saw a sports car in the victim's driveway, which resembled the car that the defendant knew belonged to the victim.

The defendant then "pulled in behind it and grabbed a bottle of Beck's beer and pounded on the door." He testified that he brought two guns with him because the victim always was armed. The victim, in his underwear, invited the defendant inside after the defendant told him that the defendant needed to

speak privately with him, and the victim handed the defendant a bottle opener to open his beer. When the defendant told the victim that he knew about the affair and how the victim treated Harris, the victim "laughed in [the defendant's] face" and "badmouth[ed]" Harris.[18] This "incensed" the defendant and made him "very angry." The defendant then responded with something that "wouldn't have been very nice," and according to him, the victim went into the kitchen and then charged at the defendant with a knife.

The defendant grasped each wrist of the victim, trying to hold the knife away from him, and they rotated around the kitchen in a "strange dance." The defendant testified that the victim fell on top of him, and it seemed that the victim still had the knife and was trying to stab the defendant. At the time of his arrest, the defendant was five feet, seven inches tall, and weighed approximately 170 pounds. At the time of his autopsy, the victim was five feet, seven inches tall, and weighed 191 pounds.[19]

---

[18] The defendant testified on cross-examination that the victim "laughed in [his] face and then . . . made very disparaging remarks about my dear wife. Remarks that were absolutely disgusting."

[19] The victim's son testified that the victim was six feet, two inches tall and weighed about 220 pounds. The defendant emphasized that the victim was taller than him.

In response to the victim's attempt to stab him, the defendant took out his .22 caliber revolver and pulled the trigger six times, until there were no bullets remaining. The defendant then pulled out the nine millimeter Taurus semiautomatic pistol and shot the victim twice as he was still trying to stab the defendant, got up, picked up his revolver and the knife, and left the home. He drove to Dover, New Jersey, where he used to live.

On cross-examination, the defendant claimed that the victim fell down on the knife, explaining his protruding intestines. The defendant stated that the knife "must have gone into [the victim's] stomach and come back out because he still had it in his hand" and continued to try to harm the defendant. The defendant disposed of the knife in the trash at a gasoline station in Connecticut. The defendant claimed that he was underneath the victim when he fired all of the shots.

b. Procedural history. The defendant was indicted on May 24, 2016, and arraigned on June 28 on charges of murder in the first degree, G. L. c. 265, § 1; two counts of unlawful possession of a firearm without a firearm identification (FID) card, G. L. c. 269, § 10 (h); one count of unlawful possession of ammunition without an FID card, G. L. c. 269, § 10 (h); three counts of a firearm violation with one prior violent crime, G. L. c. 269, § 10G (a); and possession of a large capacity

firearm, G. L. c. 269, § 10 (m).  The defendant filed a motion to suppress evidence obtained from an alleged warrantless search in the curtilage of his home on July 19, 2018.[20]  An evidentiary hearing on the motion to suppress was held on November 20.  On January 7, 2019, the motion judge, who was not the trial judge, denied the defendant's motion to suppress with written findings.

The trial began on September 30, 2019.  In closing arguments, the defense argued that the defendant acted in self-defense in response to a struggle on the floor, and asked the jury to return a verdict of manslaughter.  The Commonwealth argued that the defendant acted "in cold blood with vengeance" when he "executed . . . [and] assassinated" the victim in his home, shooting the victim ten times without missing.[21]  The Commonwealth suggested that the defendant's story was "incredible."  On October 11, the jury convicted the defendant of murder in the first degree on theories of both deliberate premeditation and extreme atrocity and cruelty, and also convicted him on the indictments charging unlawful possession of firearms and ammunition without an FID card and possession of a

---

[20] He also moved to suppress his statements to police, with which he does not take issue on appeal.

[21] The medical examiner testified that there was an eleventh "graze" gunshot wound on the victim's forearm.

large capacity firearm.[22]  The defendant filed a timely notice of appeal.

2.  <u>Discussion</u>.  a.  <u>Curtilage issue</u>.  On February 9, 2016, State police Trooper Donald Short responded to the defendant's residence to observe the Sienna in the driveway and to speak with Anthony.[23]  The defendant's residence is set back from a long driveway.[24]  A visitor approaching the front door of the home would have to walk up the driveway to get there, traveling along a walkway toward the front steps leading up to the main entrance of the home.  From the street, there was an unobstructed view of the Sienna; there was no gate around the driveway, no fence around the property, and no "no trespassing" signs posted around the property.

At around 7:30 P.M., while the defendant was at the police station, Short pulled into the driveway, observed the Sienna in the driveway, and looked at the tread pattern on the tires.  The Yaris, also in the driveway, was parked farther down and closest to the garage; the Sienna was parked to the front left of it.

_____

[22] The Commonwealth dismissed the three indictments charging a firearm violation with one prior violent crime.

[23] The relevant facts are taken from the testimony at the hearing on the motion to suppress and photographs of the driveway, vehicles, and home admitted at the hearing.

[24] From a photograph taken from behind the parked Sienna, one can observe a relatively long driveway marked at the roadway by an unmarked police cruiser.

Both were parked toward the end of the driveway closest to the house.  Earlier that day, when Abramoski went to the defendant's home to speak with the defendant, he got within five to ten feet of the vehicles as he was walking up the driveway and to the front door.

On the tread pattern of the tires on the Sienna, Short observed unique rain channels that appeared to be similar to the tread markings in the driveway at the victim's home.  Because it was dark, the tires would have had to be illuminated in order for Short to see them; he could not recall whether he used a flashlight or whether the area was illuminated in another manner.  In addition to examining the tire treads, Short looked inside the window of the Sienna and saw an open case of Beck's beer, a sleeping bag, and a "sea bag."[25]  He did not open the door or move the Sienna in any way.

Short's observations were included in the affidavits supporting the search warrant applications for the defendant's residence, the Sienna, specified information on the defendant's cell phone, and the GPS found within the Sienna.

The motion judge found that in walking to the front door of the home to speak with the defendant, Abramoski had to traverse the walkway to the front door leading from the end of the

---

[25] A "sea bag" is a type of bag "that the military used to store gear."

driveway.  "In so doing, Abramoski had to walk by an automobile parked on the defendant's property."  The motion judge also found that Short "needed to pass by an automobile in the driveway" to reach the front door of the house, and that Short "observed the tire treads as he walked by."  He ruled that the driveway was not part of the home's curtilage and that, therefore, the defendant had no reasonable expectation of privacy as to the portions of the Sienna that Short observed.

On appeal, the defendant argues that the Sienna was parked within the home's curtilage.  He asserts that the motion judge erred in finding that the Sienna would have been visible from the street, as the driveway was long and the home was private; the motion judge erred in finding that one would need to walk past the Sienna to access the front door; and Short's intent to view the tire treads in the driveway favors the conclusion that it was an unlawful, warrantless search.  Finally, the defendant argues that the Commonwealth cannot demonstrate that the Sienna would have been searched in any event pursuant to the inevitable discovery doctrine.

The Commonwealth argues that the driveway was not within the curtilage of the home and therefore not entitled to protections under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.  The Commonwealth further argues that the search

warrants would have been issued even excising the information obtained from Short's observations of the Sienna.

In our review of a ruling on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error." Commonwealth v. Leslie, 477 Mass. 48, 53 (2017), quoting Commonwealth v. Fernandez, 458 Mass. 137, 142 (2010). We "conduct an independent review of [the judge's] ultimate findings and conclusions of law" (citation omitted). Commonwealth v. Torres, 102 Mass. App. Ct. 359, 361 (2023), quoting Commonwealth v. Rosario-Santiago, 96 Mass. App. Ct. 166, 171 (2019). We do not consider the testimony at trial in reviewing the motion judge's ruling on the motion to suppress. Commonwealth v. Escalera, 462 Mass. 636, 648 (2012). "Where, as here, the issue is whether a search occurred within the curtilage of a home, 'we undertake our independent review cognizant that there is no "finely tuned formula" that demarcates the curtilage in a given case.'" Leslie, supra, quoting Fernandez, supra. There is no "bright line rule," and we must approach "curtilage questions on a case-by-case basis." Fernandez, supra at 143.

"[T]he Fourth Amendment's protection of curtilage has long been black letter law." Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018). The concept of curtilage "originated at common law to extend to the area immediately surrounding a dwelling house

the same protection under the law of burglary as was afforded the house itself." Commonwealth v. McCarthy, 428 Mass. 871, 873 (1999), quoting United States v. Dunn, 480 U.S. 294, 300 (1987). Presently, the concept of curtilage is "used to define those areas to which Fourth Amendment protections extend." McCarthy, supra. If an area "is 'so intimately tied to the home itself' that 'an individual reasonably may expect that the area in question [will] be treated as the home itself,'" it will be considered part of the curtilage. Id. at 874, quoting Dunn, supra at 300, 301. In Dunn, the United States Supreme Court set out four factors to consider in determining whether a particularly described area qualifies as curtilage: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area form observation by people passing by." Dunn, supra at 301.

Generally, "[a] driveway 'may be private according to common law concepts of property, [but] it need not be for purposes of the Fourth Amendment.'" Commonwealth v. Butterfield, 44 Mass. App. Ct. 926, 928 (1998), quoting Commonwealth v. Simmons, 392 Mass. 45, 49, cert. denied, 469 U.S. 861 (1984). Because a driveway is only a "semiprivate

area," the expectation of privacy a possessor of land may reasonably have in his or her driveway "will generally depend upon the nature of the activities [carried out there] and the degree of visibility from the street." Butterfield, supra, quoting Simmons, supra at 48. Applying the Dunn factors to a driveway may yield different results based on the circumstances present in each case.

In Massachusetts, we have considered the surrounding circumstances in determining whether a driveway is a protected area under the Fourth Amendment and art. 14. In Simmons, for example, where an officer and a victim stood in a driveway and looked for five minutes into a vehicle located between one and two feet from the driveway, directly across a path leading to the front door, we held that the defendant had no reasonable expectation of privacy in the location where the vehicle was observed. Simmons, 392 Mass. at 46-47, 49. In so holding, the court relied on the facts that the vehicle was "clearly visible" from the busy roadway and the adjacent parking area, the driveway was not enclosed by any obstructions, there was an absence of "no trespassing" signs, and the driveway was the normal means of access to the home where visitors would traverse on the way to the front door. Id. at 47, 49.

Similarly, in Butterfield, 44 Mass. App. Ct. at 928, the Appeals Court found that the defendant, on a walkway leading to

his home, and his vehicle, parked in the driveway, were not within the curtilage of the home.  Both the defendant and the vehicle were visible from the street; there was no evidence that the driveway was enclosed by trees, a fence, shrubbery, or other obstructions; and the walkway leading to the back door was one that a visitor naturally would use to reach the door.  Id. at 928-929.  See Commonwealth v. Greineder, 458 Mass. 207, 254-255 (2010), S.C., 464 Mass. 580 (2013) (vehicle outside curtilage where defendant's vehicle parked in driveway was visible from street; no trees, fences, gates, or "no trespassing" signs; and no measures taken to define area as curtilage); McCarthy, 428 Mass. at 875 (visitor parking space not within curtilage of apartment where area in between apartment and space was open to tenants, visitors, delivery persons, and maintenance workers as common area).  Cf. Commonwealth v. Thomas, 358 Mass. 771, 774-775 (1971) (cellar not within curtilage of defendant's apartment where he did not have exclusive control of any part of it, as "[i]n a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control").  But see Commonwealth v. Hall, 366 Mass. 790, 794-795 (1975) (defendant had reasonable expectation of privacy in apartment hallway where he did not share it with tenants or landlord as he was owner of building, door was locked, and buzzer system was

designed to exclude members of public); <u>Commonwealth</u> v. <u>Pierre</u>, 71 Mass. App. Ct. 58, 61-63 (2008) (defendant had reasonable expectation of privacy in storage locker in basement of apartment building, and basement was within curtilage of defendant's apartment, despite unrestricted access to basement and lack of exclusive control).

Conversely, in <u>Fernandez</u>, 458 Mass. at 144-145, the court held that the defendant's "narrow driveway, approximately the width of one vehicle and the length of two," was within the curtilage of his apartment. The driveway directly was adjacent to the three-family home, in which the defendant lived on the first floor. <u>Id</u>. at 144. No one seeking to enter the home would have reason to walk on the driveway, and the police saw only vehicles associated with the defendant parked in the driveway, pointing to his exclusive use. <u>Id</u>. at 144, 146. There was a fence separating the driveway from the neighboring building. <u>Id</u>. at 145. Although the vehicle was visible from the street, an observer of the inside of the car would have to depart from the path designed to lead to the front door, rather traveling along the side of the house down the driveway. <u>Id</u>. at 146. In these circumstances, the driveway was within the curtilage of the defendant's home. Cf. <u>Leslie</u>, 477 Mass. at 55-57 (side yard was within curtilage where it was attached to porch, where it was enclosed by fence with house and porch,

where porch was used as extension of home, and where steps were taken to protect area from view); Commonwealth v. Straw, 422 Mass. 756, 759 (1996) (fenced in back yard was within curtilage of home); Pierre, 71 Mass. App. Ct. at 62-63 (locker in basement was within curtilage where stairs in defendant's kitchen linked apartment to basement and storage locker searched was subject to defendant's exclusive control); Commonwealth v. Hurd, 51 Mass. App. Ct. 12, 15-16 (2001) (defendant had reasonable expectation of privacy in cage located in back yard and partially enclosed by fence, where cage was not visible from public street or front yard, porch, or shed doors; officer's vantage point from driveway was not determinative where driveway was not normal access to front door).

In Collins, 138 S. Ct. at 1670-1671, the Supreme Court held that a particular section of the driveway where the defendant's motorcycle was parked constituted curtilage.  In so holding, the Court described this portion of the driveway as sitting a few yards past the front perimeter of the house, enclosed on two sides by a brick wall the height of a vehicle and on the third side by the house.  Id. at 1670.  A side door provided direct access between this enclosed section and the house.  Id. at 1670-1671.  A visitor would have no reason to enter the enclosure, as he or she would turn off toward a set of steps leading to the front porch before entering the enclosure.  Id.

at 1671. The officer pulled off a tarp to expose the motorcycle. Id. at 1668.

Case law from the Federal circuits discussing driveways and a reasonable expectation of privacy reinforces the case-specific inquiry that the curtilage question demands. A prominent factor in the analysis is whether the driveway freely is exposed to public view. United States v. Brown, 510 F.3d 57, 65 (1st Cir. 2007) ("If the relevant part of the driveway is freely exposed to public view, it does not fall within the curtilage"). Where so exposed, the balance tends to favor the determination that a defendant is not entitled to a Fourth Amendment protections in such an area. See United States v. Hatfield, 333 F.3d 1189, 1194 (10th Cir. 2003) ("The openness and accessibility of a driveway to the public has been an important factor that courts have used to conclude that an owner does not have a reasonable expectation of privacy and that police observations made from the driveway do not constitute a search"). "This holds true even where the relevant part of the driveway is somewhat removed from a public road or street, and its viewing by passersby is only occasional." Brown, supra.

The majority of Federal circuit cases discussing a driveway curtilage question have found that the area at issue was not part of the curtilage of the home or that, even if it was curtilage, it was not afforded the same protections. See United

States v. Stephen, 823 Fed. Appx. 751, 755 (11th Cir. 2020) (driveway was not within curtilage of home where, although in close proximity to home, driveway was not gated, covered, enclosed, or partly enclosed; it did not serve as extension of defendant's home; occupants made no effort to conceal driveway from passersby; and it formed part of path visitors would take to walk to front door); United States v. Coleman, 923 F.3d 450, 456-457 (6th Cir.), cert. denied, 140 S. Ct. 580 (2019) (driveway adjacent to home was not within curtilage where it was not enclosed, no steps were taken to obstruct view of passersby or vehicles on way to entrance of home, and other residents shared driveway); United States v. Beene, 818 F.3d 157, 162 (5th Cir.), cert. denied, 580 U.S. 850 (2016) (driveway not curtilage despite proximity to residence because open to observation from street, and although fences encircled part of driveway, none blocked access or view from street, and no "no trespassing" signs or other attempts to protect privacy); Brown, 510 F.3d at 65-66 (top of defendant's driveway adjacent to garage was not curtilage where, although close to home and not visible from public street, there were no barriers or signs discouraging public entry, and defendant allowed patrons of his business on property); Hatfield, 333 F.3d at 1194, quoting 1 W.R. LaFave, Search and Seizure § 2.3(f), at 506-508 (3d ed. 1996) ("[W]hen the police come on to private property to conduct an

investigation . . . and restrict their movements to places visitors could be expected to go [e.g., walkways, driveways, porches], observations made from such vantage points are not covered by the Fourth Amendment"); United States v. French, 291 F.3d 945, 953 (7th Cir. 2002) ("In the past we have held that public drives, sidewalks, or walkways [even those which lead to a rear side door] are not within the curtilage of the home when they are not enclosed by a gate or fence"); United States v. Ventling, 678 F.2d 63, 64, 66 (8th Cir. 1982) (no reasonable expectation of privacy where officer drove into driveway and went to front door, noticed tire tracks in yard along driveway, and stopped to photograph them, as "a driveway and portion of the yard immediately adjacent to the front door of the residence can hardly be considered out of public view"); United States v. Humphries, 636 F.2d 1172, 1179 (9th Cir. 1980), cert. denied, 451 U.S. 988 (1981) (no violation of defendant's reasonable expectation of privacy where officer went onto driveway to examine license plate on vehicle, where vehicle was visible from street and driveway was not enclosed by fence, shrubbery, or barrier).

Nonetheless, in certain circumstances, some cases have come to the opposite conclusion. See United States v. Alexander, 888 F.3d 628, 630-634 (2d Cir. 2018) (end of long driveway in front of shed was curtilage where it extended past back of house,

enclosed by fencing on three sides, and was used for hosting barbeques, despite visibility to public); United States v. Wells, 648 F.3d 671, 677 (8th Cir. 2011) (portion of unpaved driveway extending past rear of defendant's home was within curtilage of home where officers' observations were made just behind home, visitors would need to pass paved walkway leading to front door and door to carport to get there, driveway was enclosed on three sides by fence, and it contained items suggesting use for intimate activity associated with home); United States v. Diehl, 276 F.3d 32, 39-41 (1st Cir.), cert. denied, 537 U.S. 834 (2002) (portion of property was within curtilage where significant portion of driveway was far from public view, there was bend in long driveway, portion was enclosed by forest, and inhabitants made efforts to discourage mail delivery and visits).

With this framework in mind, we apply the Dunn factors to this case.

i. Proximity. The photographs indicate that the portion of the driveway where the Sienna was parked was close to the home. Abramoski testified that both the Sienna and the Yaris were parked toward the end of the driveway, which was the portion closer to the home. Although this Dunn factor leans in favor of the defendant, the remainder of the factors suggest that the Sienna was outside the curtilage of his home.

ii.  Enclosure.  The defendant's house is set back from a
long driveway.  There was no testimony describing the precise
length of the driveway, but the photographs admitted at the
hearing allow a viewer to see an individual standing at the
front of the driveway clearly from behind the Sienna, parked
toward the end of the driveway.  The house and the driveway are
flanked with trees on the left, right, and rear, as the
defendant lived in a wooded area.  Despite the relative privacy
surrounding the defendant's home, the Sienna was visible to
passersby in the street, contrary to the defendant's assertion
otherwise, and to visitors to the home who had to traverse the
driveway to arrive at the front door.  There was no gate or
fence around the driveway.  Despite the two-bay garage attached
to the home, the Sienna was exposed on the driveway within from
five to ten feet of the walkway.  See Simmons, 392 Mass. at 47,
49; Stephen, 823 Fed. Appx. at 755.  Contrast Collins, 138 S.
Ct. at 1670-1671 (motorcycle sitting on portion of driveway few
yards past front perimeter of house, covered in tarp, and
enclosed on two sides by wall and third side by house).

The fact that the driveway to the home was located in a
rural area does not command a finding that the driveway where
the Sienna was parked was within the curtilage of the home.  See
Commonwealth v. A Juvenile (No. 2), 411 Mass. 157, 162 n.5
(1991) ("[A]n individual who lives on a relatively small public

road has no greater expectation of privacy than one who lives on a large public road. Absent some effort to conceal the driveway from public view, the relative seclusion of the neighborhood does not heighten an individual's expectation of privacy in a driveway").

iii. Use. There was no testimony that the defendant used the driveway for anything other than parking cars. As far as one can tell from the photographs, there are no items suggesting that the driveway "harbor[ed] those intimate activities associated with domestic life and the privacies of the home." McCarthy, 428 Mass. at 874, quoting Dunn, 480 U.S. at 301 n.4. See Commonwealth v. Pietrass, 392 Mass. 892, 902 (1984) (in determining whether porch part of curtilage, factor to consider is "whether the porch was furnished like a room in the interior of the house").

iv. Steps taken to protect from observation. Finally, the defendant took no steps to conceal the Sienna in the driveway, or any portion of the driveway, from observation. As discussed supra, there was an unobstructed view of the Sienna from the street, there was no gate or fence around the driveway, and there was an absence of "no trespassing" signs posted around the property. The fact that Short may have used a flashlight or another method to illuminate the tread marks on the tires of the Sienna does not transform his actions into a search for

constitutional purposes. Commonwealth v. Blevines, 54 Mass. App. Ct. 89, 92 n.5 (2002), S.C., 438 Mass. 604 (2003) ("The trooper's action in shining a flashlight into the vehicle did not constitute a search").

The defendant argues that the motion judge clearly erred in finding that the officers needed to pass by the Sienna in order to reach the front door of the house. It is difficult to conclude that this finding was clear error, because it depends on an interpretation of what the motion judge meant by "pass by." "A judge's finding is clearly erroneous only where there is no evidence to support it or where the reviewing court is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Commonwealth v. Colon, 449 Mass. 207, 215, cert. denied, 552 U.S. 1079 (2007). Abramoski testified at the hearing on the motion to suppress that he got within from five to ten feet of the Sienna as he was walking to the front door of the home. Although the photographs are not conclusive on the matter because of the snow and the angles at which they were taken, in the clearest photograph one can observe wooden steps leading to the walkway on the far right of the Sienna, which appears to be closely aligned with the front perimeter of the house. Based on that photograph, it seems that an average visitor walking to the front door would get close to the Sienna on his or her journey,

even supposing that the visitor would not be near enough to see inside. It is irrelevant that Short went to the defendant's residence, in part, for the purpose of observing the Sienna in the driveway. "The subjective intentions of police are irrelevant so long as their actions were objectively reasonable." Commonwealth v. Cruz, 459 Mass. 459, 462 n.7 (2011). This does not alter our conclusion that the driveway was not within the curtilage of the home.

Even if we were to determine that the driveway where the Sienna was parked was within the curtilage of the home, excising that information from the search warrant affidavits, probable cause would remain to search the defendant's residence and the Sienna.

> "[R]egardless of the illegality of the initial entry and search, the evidence is admissible as long as the affidavit in support of the application for a search warrant contains information sufficient to establish probable cause to search the defendant's [residence and Sienna], apart from the observation of the [tire tread marks, the Beck's beer, and the sleeping bag]."

Commonwealth v. DeJesus, 439 Mass. 616, 625 (2003).[26] "It is a simple matter to exclude from the supporting affidavit all

---

[26] As indicated by the court's explanation in DeJesus, 439 Mass. at 625, this is the more appropriate inquiry, rather than the application of the inevitable discovery doctrine. If we were to apply the inevitable discovery doctrine to this matter, the Commonwealth would meet both parts of the test. Because of the other information contained in the affidavit, discussed infra, the search of the defendant's residence and vehicle was "certain as a practical matter." Commonwealth v. McAfee, 63

information gained" by Short in relation to the Sienna on February 9 by excluding the following paragraph from the affidavits:

> "On Tuesday, February 9, 2016[,] Trooper Donald Short arrived at [the defendant's address] in Berkley. Trooper Short observed a grey Toyota Sienna parked in the driveway. The driveway led you to the stairs, which led you to the front door of the residence. The grey Toyota Sienna . . . has four tires with four rain channels and square treads on the outside of each tire. This tire pattern is similar to the tire pattern found in the driveway at [the victim's address] in Wareham by Sgt. William Tarbokas . . . (Crime Scene Services Section). Trooper Short observed from the driveway through the clear exterior windows of the Sienna an open case of Becks beer in the rear of the Sienna. There also was a sleeping bag and a green sea bag in the back of the Sienna. The left rear passenger seat was pulled all the way forward against the driver's seat."

Id. The information remaining in the affidavits, which appear to contain largely identical facts, provided ample support for probable cause for the searches.[27]

We summarize the information in the affidavits connecting the defendant to the murder of the victim. When officers responded to the victim's residence, they noted identifiable tire tracks preserved in the snow from recent traffic. The

___

Mass. App. Ct. 467, 479 (2005), quoting Commonwealth v. Perrot, 407 Mass. 539, 547 (1990). Additionally, as Short's observation of the Sienna in the driveway was not a "search" in the constitutional sense, he did not act in bad faith by "conducting an unlawful search in order to accelerate discovery of the evidence." McAfee, supra at 480, quoting Commonwealth v. O'Connor, 406 Mass. 112, 118 (1989).

[27] The affidavit for the GPS had additional facts, as it was discovered after the search of the Sienna.

victim's children, after being asked whether their father had any conflicts, told officers about the victim's relationship with Harris while she was living with the defendant.  The victim's daughter stated that the victim found it odd when the defendant invited him to the defendant's house for drinks after Harris's wake.  The officers checked the defendant's criminal record and saw that Harris had a restraining order against him in 2003 and that he had been convicted of assault and battery on an elderly disabled person in 2013, a case in which the victim was a witness.

In the victim's home, there was one partially consumed Beck's beer bottle on its side under the kitchen table; the remainder of the beer in the victim's home was "Miller High Life" brand.  Nine millimeter ammunition and shell casings were found near the victim's body.

When Abramoski arrived at the defendant's residence to speak with him, he noted two vehicles cleared of snow, the Yaris and the Sienna, both registered to the defendant.  The defendant stated that he knew the victim and met him through Harris.  He told the officers that he believed the victim and Harris to be a "little more than just friends," and produced the e-mail message that he discovered, readily available in his left shirt pocket, which, as detailed supra, revealed a years-long affair between the victim and the defendant's longtime girlfriend.  The

defendant stated that he discovered this message one week earlier.

The defendant told officers that he spoke to the victim on the telephone on February 8, 2016, the day before the victim's body was discovered.  Despite allegedly finding the e-mail message one week earlier, the defendant claimed that he never brought this to the victim's attention on their telephone call. The affair made him very upset.

On February 8, 2016, the defendant said that he left his house approximately between 10 P.M. and 11 P.M., in the severe weather, to go for a "joy ride" in his Sienna to Dover, New Jersey, because he was upset about discovering the relationship between the victim and Harris.  He stated that he stopped twice for gasoline and paid for everything in cash.  When he arrived at approximately 4 A.M., he took a nap in a store's parking lot, the location of which he could not recall, and slept for several hours.  He then visited his old neighborhood in New Jersey, of which he could not remember the exact location, and returned home.  He arrived home that day at 12 P.M.  Anthony confirmed that the defendant was not home from late on February 8 until February 9 at around 11 A.M.

The defendant stated that he knew the victim's home was in Wareham, but did not know where exactly.  He initially told officers he never owned a handgun, but then claimed he may have

owned a nine millimeter handgun that he sold to an unknown party when his license expired. The defendant was not concerned about the victim's whereabouts because "it was difficult to [still] consider the victim a friend" after finding the e-mail message. He told the officers that he drinks Beck's beer.

"Probable cause requires a '"substantial basis" to conclude that "the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues."'" Commonwealth v. Snow, 486 Mass. 582, 586 (2021), quoting Commonwealth v. Holley, 478 Mass. 508, 521 (2017). From the information summarized above, the magistrate reasonably could have inferred that the defendant had recently unearthed a motive to murder the victim, lied about owning a nine millimeter gun at some point (where nine millimeter live rounds and casings were found by the victim's body), drank the same type of beer found in the victim's home near his body, and acted in a suspicious manner on the night of the victim's murder, with no record of his activities. This information, without reference to Short's observations, provided ample support for probable cause to search the defendant's home and Sienna, where the GPS was subsequently discovered, for evidence relating to the defendant's murder of the victim. See Commonwealth v. Donahue, 430 Mass. 710, 712-715 (2000)

(affidavit provided substantial basis to search defendant's home and car for evidence of murder of his wife).

b.   Review under G. L. c. 278, § 33E.   The defendant argues that he is entitled to a new trial or a reduction of the verdict of guilty of murder in the first degree under our powers pursuant to § 33E.   As reason therefore, he asserts that an acquittal based on self-defense or a reduction to manslaughter would be more consonant with justice.   He also argues that his age, mental state, and the circumstances surrounding the killing support a reduction in the verdict.   We disagree and see nothing else in the record warranting the exercise of our extraordinary authority under § 33E.

It is our duty, under § 33E, to "consider broadly the whole case on the law and the facts to determine whether the verdict is consonant with justice."   Commonwealth v. Vargas, 475 Mass. 338, 363-364 (2016), quoting Commonwealth v. Howard, 469 Mass. 721, 747 (2014), S.C., 479 Mass. 52 (2018).   "This court's authority to reduce a conviction of murder in the first degree in the interest of justice 'should be used sparingly and with restraint.'"   Commonwealth v. Billingslea, 484 Mass. 606, 619-620 (2020), quoting Commonwealth v. Brown, 477 Mass. 805, 824 (2017), cert. denied, 139 S. Ct. 54 (2018).   We reduce convictions "only in the most compelling circumstances."   Billingslea, supra at 620.   Factors we have considered in

mitigating a verdict of murder in the first degree include, but are not limited to, whether the intent to kill was formed "in the heat of sudden affray or combat" or during a "senseless brawl"; whether the sequence of the killing reflects spontaneity rather than premeditation; whether the defendant brought a weapon to the scene; "whether the victim was the first aggressor"; whether the defendant and victim knew each other or were strangers, and the relationship between them; whether alcohol or drugs were involved; and personal characteristics of the defendant, such as age, family, disability, and lack of prior record (citations omitted). Vargas, supra at 364-365.

This case does not present a set of circumstances in which the defendant likely acted in self-defense to save himself from the victim's attack. The defendant's testimony supporting such a theory was incredible, and justifiably, the jury rejected it.

The evidence presented at trial strongly supported the Commonwealth's theory that the defendant, driven by anguish over the victim's affair with Harris, went to the victim's home in the early hours of the morning in the middle of a snowstorm with the intent to brutally kill him. By the time of the trial, the defendant admitted that he lied to police and found the e-mail messages the day before the victim was found dead. He drove to the area of the victim's house three times on the night of the murder, unassuaged when he could not locate the victim's home

the first two times.  He arrived at the victim's house with two firearms on his person.  The victim's attitude toward Harris made the defendant "very angry."  He was at the victim's home for only seven minutes.

The victim's injuries reflected the product of rage.  The victim had ten gunshot wounds that penetrated his hand, torso, chest, hip, back, lungs, organs, and brain.  In addition, he had a graze gunshot wound on his left forearm and was stabbed in his abdomen to the point that his intestines protruded.  Even recognizing that the victim owned a large number of guns, the defendant's theory was that the victim came at him with a knife, falling on the knife and then pulling it out of the victim's own stomach and continuing to stab the defendant, all the while on top of the defendant as the defendant fired off the above-mentioned shots.  There were only minor injuries located on the defendant's hands at the police station.  These facts do not comport with those that we have found justified a reduction in a verdict of murder in the first degree in the past.  Compare Commonwealth v. Salazar, 481 Mass. 105, 120 (2018) (where evidence "far from compelling," no ill will between defendant and victim, and no motive for killing, reduction warranted), and Vargas, 475 Mass. at 365-366 (jury rejected theory of deliberate premeditation, victim was initial aggressor, defendant reasonably could have feared victim, defendant swung knife in

wild manner and told third party to call 911, and killing was product of sudden combat and heat of passion), with Commonwealth v. Rodriquez, 461 Mass. 100, 111-112 (2011) (although "senseless," defendant initiated, continued, and escalated brawl, which was fueled by animus, and defendant stabbed victim viciously and repeatedly).

Similarly, there are no mitigating factors suggesting a reduction in the defendant's conviction. Although it is regrettable that Harris was unfaithful to the defendant with the victim, this did not warrant the defendant's actions in response. Cf. Commonwealth v. Ronchi, 491 Mass. 284, 295 (2023) (sudden oral revelation of infidelity does not satisfy objective element of something that would provoke reasonable person to kill his spouse).

The defendant's older age does not warrant a reduction in his conviction under these facts. See, e.g., Commonwealth v. Denson, 489 Mass. 138, 154 (2022) (declining to grant relief due to defendant's youth and immaturity where defendant was "twenty years old at the time of the stabbing and there [was] nothing in the record that indicate[d] that a reduction in the verdict on this basis [was] warranted"); Commonwealth v. Tate, 486 Mass. 663, 677 (2021) ("The fact that the defendant was nineteen at the time of the shooting is not alone enough for relief under § 33E"). We decline to reverse the verdict on this basis,

especially in light of the fact that the defendant has a prior conviction for harming an elderly person -- this is not the first time the defendant acted in a violent matter.

We reject the defendant's assertion that he was acting "under some degree of duress" at the time of the murder.  In Commonwealth v. Vasquez, 462 Mass. 827, 835 (2012), the court "reject[ed] duress as a defense to deliberately premeditated murder, murder committed with extreme atrocity or cruelty, and murder in the second degree," but left open the possibility that "in exceptional and rare circumstances of duress," the court may reduce a defendant's conviction of murder in the first degree on § 33E review.  The defendant did not act under duress in this case.  Duress "is not available to a person who recklessly puts himself in a position where coercion probably will be applied." Id. at 833.  It is

> "a present, immediate, and pending threat of such a nature as to induce a well-founded and reasonable fear of death or serious bodily injury if the criminal act is not done, with no reasonable and available chance of escape, and where no person of reasonable firmness could have acted otherwise in the circumstances."

Id. at 832-833.  Here, the defendant, on his own accord, walked into the victim's home armed with two guns in the middle of the night, angry about the victim's relationship with Harris.  He was under no threat to do so.

Having carefully examined the entire record, including, but not limited to, the photographs admitted at the trial, the defendant's statements to police, the expert testimony, and the issue with a juror in the middle of the trial, we have discerned no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial. We decline to exercise our authority to do so.

3. Conclusion. Although it does not have any impact on the defendant's murder conviction, we vacate his convictions on the two counts of unlawful possession of a firearm without an FID card and one count of unlawful possession of ammunition without an FID card, consistent with our holding in Commonwealth v. Guardado, 491 Mass. 666, 693-694 (2023) ("our holding applies prospectively and to those cases that were active or pending on direct review as of the date of the issuance of [New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022)]"). "[T]he defendant's rights under the Second Amendment [to the United States Constitution] and his rights to due process were violated when he was convicted of unlawfully possessing ammunition [and firearms] although the jury were not instructed that licensure is an essential element of the crime." Guardado, supra at 693. We need not vacate his conviction of possession of a large capacity firearm. See id. ("we decline the defendant's suggestion that we extend this holding to the crime

of unlawful possession of a large capacity feeding device").  We affirm the defendant's convictions of possession of a large capacity firearm and murder in the first degree.

<u>So ordered</u>.